IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANTONIO MANZO, MARIA MANZO,
GABRIEL DEHARO, MARIA DEHARO,
OCTAVIO PENA, JESUS LEDESMA,
IRMA ZAVALA and SIGRID DOBAT,

    Plaintiffs,

v.

HALL VINELAND PROPERTY, LLC,
KATHRYN HALL,

    Defendants.

No. C 10-05279 WHA

**ORDER DENYING IN PART MOTION FOR SUMMARY JUDGMENT AND VACATING HEARING**

## INTRODUCTION

In this mobile-home fair housing action, defendants move for summary judgment on all claims. For the reasons stated below, the motion is **DENIED IN PART.** The motion hearing is **VACATED**.

## STATEMENT

Plaintiffs are six families (five Latino, one non-Latino) living in mobile homes at Vineland Vista Mobile Home Park near St. Helena in Napa County, California. Each plaintiff currently lives in the park and has for at least nine years. In 2008, defendant Hall Vineland Property, LLC, purchased the park. Defendant Kathryn Hall, a former ambassador to Austria, was a general partner of Hall Vineland Property and actively managed the park. Plaintiffs owned their mobile homes and rented the space on which their mobile homes were parked from

defendants (Hall Decl. ¶ 7, Exh. A and B).

In the summer of 2009, Ambassador Hall met with each of the park's tenants. She explained that defendants were planning to close the mobile-home park and upgrade the property with different types of residential units (Hall Decl. ¶ 9). To some plaintiffs, Ambassador Hall said that she was going to build homes that were going to be very expensive and unaffordable to plaintiffs (*see, e.g.*, Manzo Decl. ¶ 8). She told all tenants that they would have one year from the point of formal notice to relocate and that defendants would assist them with relocating expenses (Hall Decl. ¶ 9). Plaintiffs were told that they could either transport their trailers to another park or to leave them, but that they could not sell their mobile homes to others because defendants were not allowing new residents into the park (Hall Decl. ¶ 11; *see, e.g.*, Manzo Decl. ¶ 8).

After these meetings, Ambassador Hall offered each family an amount ranging from zero to $49,000 to move (Hall Decl. ¶ 11). How defendants calculated the offer amount is disputed. Defendants contend that offers were based on the age, size and condition of each home, the needs of each family, and the amounts each family still owed on their mobile home (Hall Decl. ¶ 10–11). Plaintiffs, on the other hand, contend that Ambassador Hall told them that the longer they waited to sell their mobile homes and move, the less she would pay them (*see, e.g.*, Manzo Decl. ¶ 8). After some individual negotiations, seven families accepted defendants' offer and voluntarily moved (Hall Decl. ¶ 12). Plaintiffs all rejected defendants' offers: the Manzos ($40,000), the Deharos ($38,500), the Rios ($49,000), the Ledesmas ($43,000), Octavio Pena ($25,000), and Sigrid Dobat (zero) (Hall Decl. ¶ 13).

All plaintiffs, except Sigrid Dobat, retained the California Rural Legal Assistance as counsel shortly thereafter. In October 2009, CRLA Attorney Jeff Hoffman sent a letter to Ambassador Hall stating that defendants' actions violated the law and that all communications with the represented tenants should cease (Hall Decl. Exh. D).

In February 2010, Ambassador Hall and plaintiffs attended a meeting of the local multicultural committee to discuss what was going to happen with the park. During that meeting, Ambassador Hall explained that defendants had purchased the park as a business decision and that they intended to move forward with their plans to redevelop and upgrade it. Ambassador

2

1  Hall also explained that the redeveloped property would not include the existing mobile homes
2  and the new residential units would probably not be affordable to the current tenants.
3  Ambassador Hall reiterated her position that the tenants would have a year from the filing of
4  certain documents to move (Hall Decl. ¶ 17).
5      In a second letter sent in March 2010, plaintiffs' counsel informed defendants that they
6  may have violated federal and state fair housing laws by attempting to close the park and
7  displacing or attempting to displace its predominantly Latino residents (Hall Decl. Exh. F).
8  Plaintiffs' counsel scheduled a meeting with defendants' counsel for June 2 to discuss the park
9  closure (Hall Dep. at 176–77). One day before the scheduled meeting, defendants informed the
10 park tenants that their rents were going to be raised (Hall Decl. Exh. I). In July 2010, defendants
11 increased plaintiffs' rent. Before this increase, rents ranged from $380 to $430 per month (Hall
12 Decl. Exh. G). The increase ranged from $60 to $110 per space, which worked out to 14% to
13 29% per family. Even with the increase, plaintiffs' monthly rents were still slightly below fair
14 market value (Hall Decl. ¶ 37). This is not disputed.
15     As of the date of this order, defendants have not begun the formal process of closing or
16 changing the use of the park by submitting a redevelopment proposal to local government
17 agencies. Defendants continue to run the mobile-home park as before: providing maintenance,
18 utilities and other services, collecting rents, and responding to any tenant issues presented to
19 them. All of the plaintiffs continue to reside in their mobile homes and no tenant has been evicted
20 or forced to move off of the property (Hall Decl. ¶ 20).

**ANALYSIS**

22     Summary judgment is proper when the "pleadings, depositions, answers to interrogatories,
23 and admissions on file, together with the affidavits, show that there is no genuine issue as to any
24 material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c).
25 An issue is genuine only if there is sufficient evidence for a reasonable fact-finder to find for the
26 non-moving party, and material only if the fact may affect the outcome of the case. *Anderson v.*
27 *Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

3

1.  **RETALIATION UNDER FAIR HOUSING ACT.**

The anti-retaliation provision of the Fair Housing Act makes it unlawful to

> coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by section 3603, 3604, 3605 or 3606 of this title.

42 U.S.C. 3617.

> To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action. If a plaintiff has presented a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive.

*Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001) (citations omitted). The same standards apply to retaliation claims under California's Fair Employment and Housing Act. *Id.* at 1131; CAL. CIV. CODE § 12955.7.

### A. Plaintiffs Engaged in a Protective Activity.

Plaintiffs argue that the protected activity at issue was sending the March 2010 letter to defendants asserting their rights under fair housing laws. The letter stated, in part:

> Our clients are concerned the efforts of Hall Vineland to vacate and close or convert the Park are not in compliance with the state Mobile home Residency Law and other state and federal laws, including federal and state fair housing laws, and have resulted in premature displacement of predominately Latino residents.

Sending the letter was a protected activity because it opposed actions that were allegedly unlawful under the fair housing anti-discrimination statutes. Defendants do not dispute this.

### B. Defendants Subjected Plaintiffs to an Adverse Action.

In the context of a retaliation claim, the adverse action must be in the form of coercion, intimidation, threats, or interference. Although the statute itself does not defined these terms, our court of appeals has held that the plain meanings will control: "Interference" is the act of meddling in or hampering an activity or process. "Coercion" is compelling an act or choice by force, threat, or other pressure. "Threat" is an expression to inflict evil, injury, or other damage

4

on another. And finally, "intimidation" is an action that generates fear. *Walker*, 272 F.3d at 1123–29.

Plaintiffs argue that the notices of rent increase and subsequent rent increases were retaliatory adverse actions. The June 1 notice of rent increase stated (Hall Decl. Exh. I):

> To Our Vineland Visa Residents:
>
> Please be advised that we are in the process of having the fair market value of our park rental rates determined. We have not raised rents in some time and will be adjusting rents to reflect fair market value very soon. A rent increase is long overdue.
>
> An appraisal professional will be in the park during the next week for this purpose. So, if you see someone you don't recognize in the park taking photos and measurements, please don't be alarmed.
>
> Sincerely, Kathryn Hall

Another notice of rent increase dated July 1 stated (Hall Decl. Exh. K):

> To Our Vineland Visa Residents:
>
> As you know from my recent letter we have had our rents appraised. This has shown that our space rents are significantly below fair market value and should be at least $550 per month. Since our rents have not been raised in several years, there is a large discrepancy between your rent and the market rent. Prior to sending out an official rental increase notice we would like to determine if there are any special hardship situations (i.e. loss of job or other matter) that would impact your ability to immediately begin paying the fair market value of your space. If you would like to discuss this matter with me July 8 or 9, please call Jesus Hernandez, (707) 373-4969, or me, (707) 963-8877 to schedule a time to meet. If those two days are inconvenient, I will find a time over that weekend that works.
>
> Thank you, Kathryn Hall

On July 28, plaintiffs received rental increases ranging from 14% to 29%. Although it is not entirely clear from the record, it appears that all the tenants living in the park at that time are plaintiffs in this action. Plaintiffs do not argue that rent increases were only imposed on them and not other tenants.

A reasonable jury could conclude that the notices of rent increase and subsequent rent increases were acts of interference, coercion, threat, or intimidation. Actions resulting in monetary losses, such as through rent increases, have been construed to be an adverse action under the FHA. *See United States v. City of Hayward*, 36 F.3d 832, 836 (9th Cir. 1994) (rent

reduction forced on landlord was adverse action). Here, the rent increases were 14% to 29%. All plaintiffs have limited resources and state in their declarations that the rent increases caused them to divert money that otherwise would be used to support their families to the payment of increased rents (*see, e.g.*, Manzo Decl. ¶ 15; L. Rios, Pena, Zavala & G. Deharo Decls. ¶ 14).

### C. Causal Link Exists Between the Protected Activity and the Adverse Action.

The closeness in time between the March 5 letter asserting fair housing rights and the June 1 notice of rent increase suggest that the rent increases were done in retaliation to the protected activity. The fact that notices of rent increase were posted just one day before the scheduled meeting between plaintiffs' counsel and defendants' counsel also suggests that defendants threatened to increase the rent in order to intimidate the plaintiffs.

Plaintiffs also cite an email sent by Ambassador Hall to her staff on April 29 inquiring whether certain tenants were current on their rent (Hall Decl. Exh. H):

Hi Audrey [staff member of defendant Hall Vineland],

When was the last time the [prior owners] raised rents at Vineland vista? Can you tell from our files? Also do we have rental agreements for Manzo ([Lot] 1), Rios (2), Ledesma (8), Olivera (3), Dobart (5), Pena (7)? If so would u pls pull those files? Each of these tenants is current on rent, correct? Also, do we send out notice each month regarding rent or utilities? I am considering a rent increase as of june 1, so we would have to send notices out this Friday I believe. Last question: what kind of insurance do we have on the property? I would like to take a look at the insurance file. I will be at the office a little before 1 pm today and if possible would like to review these docs then.

Thanks

Kathryn

The parties dispute whether, in the email, Ambassador Hall singled out the tenants then represented by CRLA or simply listed the names of all tenants then living in the park. However, neither side supports their contention with dispositive evidence of which tenants were represented by CRLA in April 2010 and whether Ambassador Hall knew that at the time of the email. The most probative evidence submitted is a letter dated October 2009, six months before the email. That letter sent by CRLA to Ambassador Hall stated the following: "We currently represent the residents living in Spaces 1, 2, 7, 8 and 9, and some of the other residents have been referred to

6

us" (Hall Decl. Exh. D). Thus, although there was not identical overlap between the identified tenants in the October 2009 letter and April 2010 email, there was significant overlap. Moreover, the October 2009 letter indicated that non-identified tenants had been referred to CRLA and may have been clients by April 2010. Viewing the evidence in the light most favorable to plaintiffs, this order presumes for the purposes of this motion that the April 2010 email identified only tenants represented by CRLA and no one else.

In January 2010, Ambassador Hall wrote an email to Napa County Supervisor Diane Dillon after she learned that the City of St. Helena was considering a resolution supporting the plaintiffs. Ambassador Hall wrote (Chang Decl. Exh. A-9):

> No jurisdiction. And an attempt to downzone our property by a statement of intent. Fighting words! I also consider this unfair – pandering and false hope – to the residents as it gives our tenants false hope that the property will remain affordable which it will not. The only tenants we will have left at VV [the park] in a few months are the 5 tenants represented by CRLA. This is a bad tactic from the remaining tenants' perspective vis a vis us. – Will begin a round of legal fee expenses and mean less to them. The other tenants have received a lot of money and moving forward.

This email, which was sent after defendants already had known that some tenants retained counsel, also suggests that defendants had ill intent towards the CRLA-represented tenants. Based on the timing of the notices of rent increase, the April 2010 email singling out CRLA tenants, and the January 2010 email to Napa County, this order finds that a reasonable juror could conclude that there was a causal link between the March 2010 letter and rent increases. Plaintiffs have met their prima facie burden of showing unlawful retaliation for the purposes of this motion.

Defendants argue that the timing of the adverse action does not support a retaliation claim because defendants had known that some tenants retained CRLA as counsel back in October 2009, eight months before notices of rent increase. While it is true that defendants knew that some tenants had retained counsel then, this does not categorically refute the inference that the rent increases were retaliation for the March 2010 letter. The March 2010 letter laid out in greater detailed than before the alleged illegalities of defendants' conduct and would have indicated to defendants that the tenants were serious about enforcing their FHA rights.

7

### D. Legitimate Nondiscriminatory Reason For Its Decision.

Defendants argue that they did not increase rents to retaliate against the plaintiffs; instead, rents were increased because they were below the fair market value and the mobile-home park was operating at a loss. Plaintiffs do not dispute that their rents were below market or that the mobile-home park was operating at a loss. Nor do plaintiffs argue that rents were only increased for CRLA-represented tenants. Based on the undisputed fact that rents were below market and the park was operating at a loss, this order finds that defendants have met their burden of showing a legitimate nondiscriminatory reason for increasing rents.

### E. Nondiscriminatory Reasons Were Arguably a Mere Pretext For a Discriminatory Motive.

Plaintiffs argue that the business reason for increasing rents was merely a pretext for retaliation against tenants for raising their fair housing rights. A plaintiff may prove pretext by showing either that a retaliatory reason motivated the defendant or that the proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable. *Walker*, 272 F.3d at 1130.

Viewing the evidence in the light most favorable to plaintiffs, there are sufficient facts to show that a retaliatory reason motivated the rent increase. Although defendants purchased the park in July 2008, the rent was not increased until two years later in July 2010. Defendants only took steps to increase the rent, such as inquiring about the last rent increase and whether CRLA-represented tenants were current on their rent, shortly after tenants sent a letter asserting their fair housing rights. As discussed, Ambassador Hall's April 2010 email regarding rent increases only listed the tenants represented by CRLA and no one else. And her January 2010 email stated that it was a "bad tactic" for the plaintiffs to retain counsel and that the property would not remain affordable to them. Viewed in the light most favorable to the plaintiffs, a reasonable juror may find that retaliation motivated the rent increase.

Defendants argue that they did not increase the rents in 2008 or 2009, even though rents were below market value, because they did not want to add to tenants' financial burden if those tenants were ultimately going to relocate (Hall Decl. ¶ 27). This argument only raises a genuine

8

dispute as to defendants' motive for raising the rent. Summary judgment against plaintiffs' FHA and FEHA anti-retaliation claims are **DENIED**.

### F. State Claims Arising Under a Retaliation Theory.

For the same reason there is a genuine dispute over material fact as to whether defendants retaliated against plaintiffs, any state claim arising out of the retaliation theory survives summary judgment as well. This includes Claims 3, 4, 5, 8, 9, 10, 11, and 12 of the operative complaint.

### 2. DISPARATE IMPACT UNDER FAIR HOUSING STATUTES.

The FHA makes it unlawful to "refuse to sell or rent . . . or otherwise make unavailable, or deny, a dwelling to any person because of . . . national origin." 42 U.S.C. 3604(a). Similarly, California's FEHA makes it unlawful to provide housing terms based on national origin discrimination. CAL. GOV'T CODE § 12955. A plaintiff may establish discrimination in violation of the FHA under a theory of disparate treatment or disparate impact.

To establish discrimination under a theory of disparate impact, a plaintiff must establish (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices. The discriminatory impact must be proven; an inference of discriminatory impact is not sufficient. A defendant may rebut a plaintiff's proof of disparate impact by supplying a legally sufficient, nondiscriminatory reason. *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114–18 (9th Cir. 2008).

Although disparate treatment was alleged in their pleadings, plaintiffs do not cite any evidence of discriminatory intent in their opposition brief to this motion for summary judgment. Instead, plaintiffs argue their discriminatory claim solely under a theory of disparate impact. Specifically, plaintiffs argue that defendants' redevelopment plan to install condominiums will remove mobile homes that house many Latino families and install expensive units will be unaffordable to many Latinos.

The parties' briefs are not sufficiently developed enough to decide summary judgment on plaintiffs' discrimination claim under a disparate impact theory. There is a serious question as to whether plaintiffs' claim is ripe for adjudication before a more specific redevelopment plan is

9

finalized. Perhaps the parties have a present need for guidance as to what defendants, who are private landowners, can and cannot do when redeveloping their mobile-home property. Nonetheless, the Court is unwilling to give mere advisory opinions.

Plaintiffs' claims will be bifurcated. Further possible consideration of summary judgment on plaintiffs' FHA and FEHA discrimination claims will occur *after* a trial on the retaliation claims and any claim arising out of a retaliation theory. The trial date will stand at **MARCH 19**.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is **DENIED IN PART**. The FHA and FEHA retaliation claims and any claims arising out of a retaliation theory will go to trial on **MARCH 19.** After that trial, there will be a further case conference to address how to resolve any remaining claims. The motion hearing is **VACATED**.

**IT IS SO ORDERED.**

Dated: February 23, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

10